*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-2048**

Corrine M. Fingalson,
Appellant,

vs.

George A. Carlson and Jeanette D. Carlson,
individually and as trustees under the Carlson Family Revocable Living Trust
Dated December 8, 2005,
Respondents,

William R. Osterman, et al.,
Respondents.

**Filed August 29, 2016
Affirmed
Muehlberg, Judge\***

Becker County District Court
File No. 03-CV-14-433

Corrine M. Fingalson, Frazee, Minnesota (pro se appellant)

George A. Carlson, Jeanette D. Carlson, Callaway, Minnesota (pro se respondents)

Samuel S. Rufer, Pemberton, Sorlie, Rufer & Kershner, P.L.L.P., Detroit Lakes, Minnesota (for respondents William R. Osterman, et al.)

Considered and decided by Peterson, Presiding Judge; Hooten, Judge; and Muehlberg, Judge.

---

\* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**MUEHLBERG**, Judge

Appellant Corrine Fingalson challenges the district court's rejection of her claims related to real property located in Becker County. Fingalson asserted that she was a party to a contract for deed to purchase the property. Because the record supports the district court's conclusion that no contract for deed or purchase agreement involving Fingalson was ever formed, we affirm.

## FACTS

Corinne Fingalson began negotiating in late 2011 or early 2012 with respondents George and Jeannette Carlson to purchase approximately 50 acres on a contract for deed, following her brother's abandonment of a previous contract for deed with the Carlsons. The property included a main house and a smaller cabin. Fingalson and the Carlsons negotiated for about a year and a half, during which time Fingalson occupied the property. From April 2012 through October 2013, she made monthly payments to the Carlsons in the amount of $1,185. Fingalson made some improvements to the property, paid homeowner's insurance, and had tenants of her own from whom she collected rent.

Both parties proposed written contracts for deed, but they varied in some of the basic terms. Fingalson and the Carlsons agree that they never executed a written contract for deed, but they dispute whether there was an enforceable oral agreement. Fingalson and the Carlsons agree that, under any of the proposed contracts, a down payment of $10,000 was a term of the agreement, but they do not agree about when the payment was due or whether it was a condition precedent to contract formation. George Carlson testified that he also

insisted on other conditions—such as Fingalson paying back-taxes owed on the property and Fingalson replacing the roof of the house—that were never satisfied. In June 2013, George Carlson sent a letter to Fingalson expressing concern that she had not made necessary improvements to the property, that she had not made the down payment, and that the property was generally deteriorating. It seemed likely the parties would agree to a purchase price of $165,000. Fingalson conceded she never made the down payment.

In the summer of 2013, Fingalson began negotiations with respondents Bill and Tonya Osterman to sell them a 31-acre parcel of the property that included the main house. Fingalson intended to keep the 19-acre parcel and the smaller cabin for herself. Fingalson presented herself as the owner of the property with full authority to sell, and she did not disclose her dealings with the Carlsons to the Ostermans.

Fingalson testified that, on October 8, 2013, the Carlsons notified her that their lawyer had finished preparing a final contract for deed and that they were ready to sign. Fingalson testified that, on the same date, she proposed to the Carlsons that the 31-acre portion be transferred directly to the Ostermans, while Fingalson would purchase the 19-acre portion.[1] Fingalson testified that the Carlsons initially agreed to this arrangement. The Carlsons, on the other hand, testified that they were not pleased with the contract drafted by their lawyer in October 2013 and expected that they would soon be initiating an eviction action based on their dissatisfaction with Fingalson's maintenance of the property

_____

[1] Fingalson saw this as a "work-around" for her plan to sell the 31 acres to the Ostermans, because she had learned that if the property passed through her possession it would become encumbered by several unresolved judgments against her.

3

and her failure to make a down payment. Fingalson and the Carlsons did not sign the proposed contract.

On October 9, 2013, Fingalson executed a purchase agreement with the Ostermans for the 31-acre parcel. Fingalson still had not made the Ostermans aware of her dealings with the Carlsons.

In late October 2013, the Ostermans began occupying the main house on the 31-acre parcel. As they were waiting for proceeds from the sale of their previous home, they agreed to pay rent to Fingalson and delay closing on the purchase. They paid $5,000 in earnest money to Fingalson. The Ostermans also issued a check for half of the surveyor's fee to split the property into the 31-acre and 19-acre parcels and another check for $900 for one month's rent to Fingalson, but they later canceled the checks before Fingalson deposited them.

On December 1, 2013, Doug Carlson, the Carlsons' son, approached Bill Osterman and informed him that Fingalson did not own and was not authorized to sell the property. Doug Carlson told Osterman that the Carlson family owned the property and gave Osterman an ultimatum, saying, "you either buy it all or none" of it, and offered to sell all 50 acres for $180,000. Doug Carlson expressed to Osterman his concern that Fingalson was trying to "screw over" his parents.[2]

---

[2] It appears the Carlsons realized that Fingalson's proposed arrangement would result in the loss of the anticipated benefit of Fingalson's interest payments. The Carlsons had hoped to collect six percent interest annually over 20 years at a purchase price of $165,000. George Carlson lamented the substantial decrease in their profit if they went through with an all-at-once sale at the same price. This, combined with their concern over Fingalson's failure to meet their conditions, seems to have motivated the Carlsons to terminate negotiations with Fingalson and prefer to pursue a deal with the Ostermans.

4

On December 2, 2013, the Ostermans signed a purchase agreement to buy the 50-acre property from the Carlsons for $180,000. The purchase closed on December 12, 2013. Fingalson was not a party to the agreement.

Fingalson sued the Carlsons and the Ostermans. Fingalson argued that her conduct demonstrated partial performance on an oral contract for deed and that the deal between the Carlsons and the Ostermans amounted to stealing. The Carlsons argued that, in the absence of substantial agreement on the terms of a contract for deed, Fingalson's occupancy of the property and her monthly payments resulted in a landlord-tenant relationship. In February 2015, the district court denied the Ostermans' motion for summary judgment. A court trial took place on May 18, 2015. Fingalson testified, as did George and Jeanette Carlson and Bill Osterman. All parties were represented by counsel. At the close of Fingalson's case, the defendants moved for judgment as a matter of law (JMOL). The district court denied the JMOL motions and proceeded with testimony and admission of further evidence.

In August 2015, the district court issued a written order ruling that the Ostermans were the valid owners of the entire 50-acre property. The district court concluded that there was no contract for deed or any other purchase agreement between the Carlsons and Fingalson because there was no meeting of the minds beyond a monthly lease. The district court additionally held that the statute of frauds applied to a transfer of real property and reasoned that, because there was no writing, any oral agreement would have been unenforceable. The district court rejected Fingalson's partial-performance argument,

concluding that her monthly payments reasonably reflected a "fair rental value" for the property.

The district court also held that the Carlsons were unjustly enriched by Fingalson's payment of homeowner's insurance, because she was merely a tenant. The district court entered judgment against the Carlsons in favor of Fingalson for ten months of homeowner's insurance payments. The district court also entered judgment against Fingalson in favor of the Ostermans in the amount of $2,601, which was equal to their earnest money paid to her ($5,000) minus half of the surveying fee paid by Fingalson to have the parcel split ($2,399). The district court found no negligent misrepresentation, conversion, fraud, or slander of title, and rejected all claims on those bases. The district court also rejected all claims for attorney fees.

At the time of trial, the Ostermans occupied the 31-acre parcel and the main house, and Fingalson occupied the 19-acre parcel and the cabin. An eviction action against Fingalson related to her ongoing occupancy of the cabin and the 19-acre parcel was stayed during the pendency of this case.

## D E C I S I O N

Fingalson, appearing pro se in this appeal, asserts that the district court erred in rejecting her claims that the Carlsons and the Ostermans breached contracts with her. She seeks specific enforcement of a contract for deed with the Carlsons and of a purchase agreement with the Ostermans.

"In order to state a claim for breach of contract, the plaintiff must show (1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to

6

demand performance by the defendant, and (3) breach of the contract by defendant." *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011). "The test of contractual formation is an objective one, to be judged by the words and actions of the parties and not by their subjective mental intent." *Hill v. Okay Constr. Co.*, 312 Minn. 324, 332, 252 N.W.2d 107, 114 (1977). Although the law does not require "that the parties agree on every possible point," specific enforcement demands "that the parties' intent as to the fundamental terms of the contract can be ascertained with reasonable certainty." *Id.* "Generally, the existence of a contract, as well as the terms of that contract, are questions of fact to be determined by the fact-finder." *TNT Props., Ltd. v. Tri-Star Developers LLC*, 677 N.W.2d 94, 101 (Minn. App. 2004).

The district court determined that the parties' disagreement over the due date for the down payment and the existence of various conditions precedent to contract formation were "evidence of the absence of a meeting of the minds." The record supports this determination and we will not disturb it. Because no contract for deed was formed with the Carlsons, Fingalson's claims for specific enforcement of that contract for deed and her purchase agreement with the Ostermans must fail.

The district court also concluded that Minnesota's statute of frauds would apply, requiring that any agreement be memorialized in writing. *See* Minn. Stat. § 513.05 (2014) (applying writing requirement to every contract for the "for the sale of any lands"); *Crossroads Church of Prior Lake v. County of Dakota*, 800 N.W.2d 608, 614 (Minn. 2011) (stating that statute of frauds requires that any contract for the sale of land be made or reflected in a signed writing). Fingalson argues that her partial performance on an oral

contract for deed exempts the contract from the statute of frauds requirement. *See Shaughnessy v. Eidsmo*, 222 Minn. 141, 146-47, 23 N.W.2d 362, 366 (1946) (noting that partial performance in reliance on an oral contract may take a contract out of the statute of frauds). But because the district court determined that there was no meeting of the minds to form a contract for deed, and therefore that there was no oral contract, Fingalson's partial-performance argument fails. The district court properly applied the statute of frauds as another bar to Fingalson's claim.

Finally, Fingalson mentions her rejected claims for unjust enrichment and conversion, but does not adequately brief these issues. *See Larson v. State*, 801 N.W.2d 222, 228-29 (Minn. App. 2011) (holding that issues not adequately briefed on appeal are waived), *review denied* (Minn. Aug. 7, 2012). Even if we overlook Fingalson's failure to adequately brief these issues, the claims hinge on factual and credibility determinations, which are the sole province of the district court. Minn. R. Civ. P. 52.01; *see JEM Acres, LLC v. Bruno*, 764 N.W.2d 77, 84 (Minn. App. 2009) (rejecting challenge to jury verdict based on credibility and factual determinations). Fingalson's claims for unjust enrichment and conversion were properly handled by the district court.

**Affirmed.**